UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANDRE YARNELL MADDOX,

                              Plaintiff,

                -vs-

ANDREW M. SAUL, COMMISSIONER OF
SOCIAL SECURITY,[1]

                              Defendant.

DECISION AND ORDER

18-CV-6201-CJS

_____

**APPEARANCES**

| | |
|---|---|
| For Plaintiff: | Mary Ellen Gill, Esq.<br>Law Offices of Kenneth Hiller<br>6000 North Bailey Avenue, Suite 1A<br>Amherst, NY 14226<br>(716) 564-3288 |
| For the Commissioner: | Dennis J. Canning, Esq.<br>Justin Davids, Esq.<br>Office of the General Counsel<br>Social Security Administration<br>601 E. 12th Street, Room 965<br>Kansas City, MO 64106<br>(816) 936-5830<br><br>Rebecca Hope Estelle, Esq.<br>Susan Jane Reiss, Esq.<br>Social Security Administration<br>Office of General Counsel<br>26 Federal Plaza, Room 3904<br>New York, NY 10278<br>(212) 264-2023 |

---

[1] The president nominated Andrew M. Saul to be Commissioner of Social Security and the Senate confirmed his appointment on June 4, 2019. He is substituted pursuant to Fed. R. Civ. P. 25(d). The Clerk is directed to amend the caption to comply with this substitution.

Kathryn L. Smith, A.U.S.A.
U.S. Attorney's Office
100 State Street
Rochester, NY 14614
(585) 263-6760

## INTRODUCTION

**Siragusa, J.** Andre Yarnell Maddox ("Plaintiff") brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Supplemental Security Income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Both the Commissioner and Plaintiff have filed motions for judgment on the pleadings. Pl.'s Mot., Oct. 19, 2018, ECF No. 13; Comm'r's Mot., Nov. 16, 2018, ECF No. 16. For the reasons stated below, the Court grants Plaintiff's motion for judgment on the pleadings, ECF No. 13, and denies the Commissioner's cross-motion, ECF No. 16. The ALJ's decision is reversed, and the matter is remanded to the Commissioner for a new hearing pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## BACKGROUND

Plaintiff filed his application on April 16, 2015, for supplemental security income benefits alleging a disability beginning January 1, 2013. R. 19. [2] The Commissioner denied his claim initially and, at his request, Plaintiff testified via video conference before an Administrative Law Judge ("ALJ") on December 14, 2016. A vocational expert also testified. Though offered an opportunity to adjourn the hearing to obtain counsel, Plaintiff elected to proceed pro se.

---

[2] R. refers to the certified record of proceedings filed on August 7, 2018, ECF No. 10.

The ALJ issued a nine-page decision dated May 12, 2017, finding that Plaintiff was capable of light work and was, therefore, not disabled. R. 19–28. The Appeals Council denied Plaintiff's appeal on January 9, 2018, making the ALJ's decision the final decision of the Commissioner. Plaintiff filed suit on March 9, 2019, ECF No. 1.

## STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405(g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2007). The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 149 (1997).

When determining whether substantial evidence supports the Commissioner's findings, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Section 405(g) limits the scope of the Court's review to two inquiries: determining whether the Commissioner's findings were supported by substantial evidence in the record,

and whether the Commissioner's conclusions are based upon an erroneous legal standard. *Green—Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003); *see also Mongeur*, 722 F.2d at 1038 (finding a reviewing court does not try a benefits case *de novo*).

Under Rule 12(c), the Court may grant judgment on the pleadings where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

## ANALYSIS

Plaintiff contends that the ALJ erred by failing to obtain any functional opinion of Plaintiff's physical limitations, failing to obtain any treating or consulting opinions relating to Plaintiff's mental capabilities, and failing to obtain progress notes from a licensed certified social worker. Pl.'s Mem. of Law 11–16, Oct. 19, 2018, ECF No. 13-1.

After reviewing the medical evidence and Plaintiff's testimony, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work. R. 23. Specifically, the ALJ wrote:

> the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except he can occasionally climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. He is limited to performing simple, routine tasks and he can tolerate occasional contact with supervisors, co-workers, and the general public.

R. 23–24. In reaching that conclusion, the ALJ gave great weight to Disability Determination Services evaluator T. Harding, Ph.D. Additionally, the ALJ considered treatment notes from John Horton-Young, LMHC, Wade Turnipseed at Rochester Mental Health Center, Kasinath Patil, M.D., and Prakash Reddy, M.D., psychologist, as well as Plaintiff's own testimony at the hearing. With regard to Plaintiff's testimony, the Court first addresses Plaintiff's pro se status.

At the hearing in December 2016, Plaintiff informed the ALJ that he tried to obtain counsel, but that all the lawyers he approached said they needed more time to obtain medical records. R. 34–35. The ALJ asked the following questions and Plaintiff made the following responses concerning representation:

> ALJ: Okay. And I was going to ask you about the medical. I do see, you did submit a recent medical treatment form. And I was like there's some records that I don't have yet. And you indicated that, I think starting January 2016, you started seeing some people, it looks like. And that's why I had you fill that authorization out, that Ms. Kane gave you. What that does is it'll enable Social Security to go ahead and request the records directly. So, we can make the request. Show them the authorization that you've allowed us to do that. And they can submit the records to us. And I'll have them do that. But getting back to the representation issue. Again, now, you clearly you, at some point, wanted representation. You did have a representative. I don't see there's been a prior postponement in the case. Based on what you're telling, it sounds like you've been talking with some representatives. You want to get a representative. And if that's the case, I'll certainly be willing to grant a postponement today. So, I can do that for you. Basically be adjourned and you'd be rescheduled for a hearing at a later time. So, this would, indeed, be the time to secure a representative. There wouldn't be a second postponement to get a representative. So, if that's what you'd like to do today, I can grant that request. Is that what you would like to do?
>
> CLMT: No, I think we, we can just go through with it. Because I'm doing, I'm doing everything I got to, I need to be doing out here, as far as my mental health, my physical therapy.
>
> ALJ: Okay.
>
> * * *
>
> ALJ: Okay. All right. Well, that's good then. All right, all right. Let's make sure we have the current address then. And so, look, on your request, if you want to proceed today, that's something you want to do. So, we can proceed today, without a representative. But I did want to let you know that I would be willing to postpone. But you did say you wanted to go forward today?
>
> CLMT: Yeah, because I'm, I'm pretty much, I'm, I'm doing everything. I've been doing, I've been doing every, my mental health and stuff for years. I never stopped doing my mental health. You know, I've got a son that got murdered. I lost my mom. It's just, I can't be out here doing it alone. So, I've always been doing my mental health. Always—
>
> ALJ: All right.... I will honor your request, of course, and proceed today, without

you being represented.

R. 35–36, 38–39. The ALJ then explained to Plaintiff what he was required to show in order to be eligible for benefits. R. 40.

After the preliminary inquiry, the ALJ then placed Plaintiff under oath and elicited his testimony. Among the questions asked by the ALJ, and answered by Plaintiff, were the following concerning his physical limitations:

> Q All right, Mr. Maddox, let me switch gears again. And you started talking about some mental health issues. And then also a low back issue, you mentioned. Let me give you a chance to talk about that. You're under oath, now. And I'll give you a chance to provide some testimony about that. Let's just start with the physical issues you may having. And that's your low back. Can you talk about any physical issues, including the back?
>
> A Well, it's my back, and let me see. Like, back in '09, coming outside of my apartment, on Griffin Street in Rochester, coming out on my porch. Came out on my porch one day. And the house was, like, one of the old houses in the Myrtle Avenue area. Came out on my porch that morning, [INAUDIBLE] morning. This when I was heavier too. I was, like, 297 then. I used to be 6X, I'm a 3X now. I'm down to my weight, I ain't [sic] that heavy no more. But I was heavier. And then, I bam, and landed. Took a bad fall on my back, on my backside, and on my, my back. And, and that was then. And they give me, they give me, it was giving me problems, problems at times. Where I can't, I can't lift heavy no more. I used to, I used to work out. I can't lift heavy weight no more. I can't lift period. I got to, I got to kneel down to pick stuff up. It's just—my physical therapy is, my physical therapy is good. I do physical therapy for my back. And it's helpful. There's [sic] things that I can do at the house, that they show me. And I can do my physical therapy[,] but I got, I got medicines that—I got, like, two different gels that I put. That my doctor prescribed me for my back. That I apply to my back daily, when I have pain. Then I—there's certain things I do at the house. Like, I've got physical therapy tomorrow. But, it's just, it happened back then in '09. But it's, like, you know, it's, it's '15 now. And it's, like, well, I just turned 48, Saturday.
>
> ALJ: Okay.
>
> A And so I'm older now. And just, I can feel things, like, with the weather. When the weather I notice, you know, when the weather's just colder I can, I can feel the tightness in my back. And feel certain differences. You know, I think that I'm, it just, I can't, I can't do a lot of things like I used to. I played ball.
>
> Q But, and, and let me ask you about that. Because you mentioned you can't lift heavy weights anymore. Can you talk to me a little bit about what limitations

6

you have there, in terms of how much can you lift now, comfortably, without—

A Before my back got screwed up, I used to be able to pick up 100-pound dumbbells, off the floor. Now, I can, I think I can only, I'd, like, do 35. 30 pounds at the most. I can do the 35 dumbbells now. Just 35, But I can't do that 50, I used to do the 50, 75, 100-pound dumbbells, I could—that was before I got all screwed up. But

Q Okay.

A —yeah, light, light, 35, 35 at the most.

Q All right. And how about any issues standing or walking in to the back? You noticed any issues there, if you're standing or walking?

A What I've been noticing—I told my therapist last week. I said what I had been noticing that when I walk for long period, a long period of time, I can feel my, my back trying to tighten up. But other than that, you know, it's just—as far as picking things up, I have to kneel down, I have to kneel down a certain way. I just can't bend straight over. I can't play recreational basketball, like I used to, you know, stuff like that. I'm just very—I got to get me a copper, my mother gave me Copper Fit back brace, one of those Brett Favre things, for my back. I just got to get some support for it. But, it's just some things that I, I can't do like I used to. Like I was able, used to be able to do as far as lift heavy weight and play—

Q Okay.

A —play basketball and things of that sort.

Q All right, any you also mentioned some mental health issues. But before we go onto that, are there any other physical issues, apart from the back, that you want to let me know about, before we turn to the mental health issues?

A No, it's just, just—I just got my lower back thing going. That's the only thing.

* * *

Q All right, let me, let me just stick with the physical for a minute then, and just ask you. Do you believe that the physical issues, the back and then your allergies. Do they prevent you from doing any kind of work? You're not able to do any work at all?

A It just depends on the environment.

Q Just the physical aspects?

A It could be, like, limited, very limited. It depends on the environment. It depends on—

Q Okay.

A —the area. But, you know, it's limited.

Q All right. Okay, limited. Okay, so, I'm not so sure that's what I'm trying to get at. Because the program relates in terms of whether someone will do any kind of work at all, any kind of substantial gainful activity. And you also mentioned all of these—and we'll talk about that too. But how so, how do you think, what sort of environment do you think you could work in given the physical issues you mentioned?

A Not, it's, light, light duty, you know. Light, you know, not, not too—an environment where it triggers my—I'm inhaling things. And I'm coughing and sneezing and—it depends on the area. And then it's, like I said, it's limited, you know, like, as far as what I can do. No heavy lifting, I can't do that. I can't—I used to be a Ford technician. I can't do that no more. Do the buffer things and extract. I can't do that no more. I used to do that and mess with heavier machinery. I just can't do stuff like that no more. Being around the chemicals and stuff, my allergies.

Q Okay.

A And my allergies, oh, man, it's just, it's crazy. Like, I, I brought this because I thought I was going to be coughing and sneezing when I come in here. But I, I didn't cough. I looked, I looked at the vents. And I was, like, wow, I'm surprised I'm not coughing and sneezing in here. I usually, I go in certain areas and then I, I go to coughing.

Q Okay.

A Sneezing, my allergies.

R. 45–47; 49–50.

Plaintiff also testified concerning his mental limitations in the following questions and answers:

Q Well, let's just—I want to leave time for you to talk to me about your mental health issues. Talk about those. What are you experiencing mental health wise? What kind of symptoms?

A Sadness, sadness, sadness at times.

Q Okay. And do you take any medication for those symptoms? Are you in any kind of therapy?

A Yes, I do, I go to mental health. I go to intern [INAUDIBLE]. I go to Intern Mental

8

help –

Q All right.

A —before I, before I relocated. I used, I was member at Rochester Mental Health in [INAUDIBLE]. I've been doing it for years, years. I go to internment. And I see my therapist once every two weeks. And my talking—

Q Okay.

A —I just talk about stuff. I call, I get the little emotional at times, over my moms and my son. My mom, lost my mom in 2009. And my son got murdered in 2006, so, you know. I'm, I'm strong. I'm a lot stronger than I used to be but, you know, I'm, I'm okay. I'm okay. I just take meds. And I talk to my therapist. And I pray, I pray a lot. But it's just, it's just hurtful, just hurtful sometime. I miss my mom. I miss my son. My son got murdered. And then the dude that, the guy that murdered him, he got out. He's out. He happened to get out on manslaughter. He, he happened to get out on—he didn't even, he did, like, seven years and came home on a manslaughter charge. And we had, we was going to testify and stuff against him. But the, the witnesses was threatened, and all that. So, it's just a bunch of crap. It's just—I'm not, I'm not scared. But I, I just, I just, it's just, it's not, it's not fair, it's not fair. And I feel more—

Q And did you—

A —more people should been [sic] brought in on it, on my son murder, more people.

Q Okay.

A And it just.

Q Well, let me ask you about those symptoms. The sadness you mentioned. Do you find that sort of interferes with your ability to do things day to day?

A Sometimes, like, I have my moments. Sometime when I go through, I just, like, I have to isolate myself. Because I can, I can, I can get upset fast. I can get upset fast and have attitude, just stuff, things that I sort but, I, I—be angry inside sometime. But then, you know, I pray out, I'm, I'm a very Godly, I'm very Godly now, too also, along dealing with this, with my, my mental health and all. So, you know, I, I talk to God. I pray. I read my Daily Bread every morning. You know, things like that. I listen to my—I don't go to church, but I do the church radio. I listen, I'm on every Sunday, in the morning, I listen to my Gospel. And my, there's two speakers that come on every Sunday, I listen to. Just to keep myself a little more humble because, you know, it, it hurt. At least the holiday—

Q Okay.

A —around the holiday time, is, like, a really time I feel, with my mind. Like

>Thanksgiving, Christmas, this is the time that I feel is, like, my seasonal depression time. Well, you know, I feel I miss my mom. We all miss her. My grandmother, my sons, we miss her. But I miss my son. You know, I think about him, and his birthday coming up. January, he's a New Year's baby. So, his birthday coming up in January. So, it's just things that I have to prepare myself for. But I go through. But I know these dates, these anniversaries and these dates. And I know these things come, but I just, I just be strong and get through them. But—

R. 50–53. Plaintiff's primary physical limitation is pain in his lower back. Were he to be examined by a medical doctor, the doctor would obviously rely on Plaintiff's description of the pain during the doctor's assessment of Plaintiff's ability to lift, push, pull, sit, stand, and walk. In his testimony, though, Plaintiff has already discussed his abilities, under oath, and testified that he was capable of lifting up to 30 pounds, and walking (though not for long periods of time). He made no mention of whether he was limited in sitting, pushing, pulling, etc.

>Light work is defined by the Commissioner as follows:
>
>Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967 (Lexis Advance through the August 21, 2019 issue of the Federal Register. Title 3 is current through August 2, 2019). Although Plaintiff's testimony covered some of the activities listed in the regulation, particularly with regard to sitting, standing, and walking. For those activities, Plaintiff's testimony was vague, at best.

The ALJ's RFC determination here is not based on a medical opinion. An RFC determination made without the benefit of a medical opinion is insufficient to support the substantial evidence standard. Instead, it demonstrates that the ALJ substituted his own non-

expert medical opinion for that of a physician. *See Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error."); *accord Cutre v. Berryhill*, No. 17-CV-135-FPG, 2018 WL 3968385, at *3 (W.D.N.Y. Aug. 20, 2018); *Legall v. Colvin*, No. 13 CV 1426(VB), 2014 WL 4494753 (S.D.N.Y. Sept. 10, 2014).

The Commissioner, however, counters that Plaintiff's argument that an RFC finding must be based on a medical opinion is wrong: "At the outset, Plaintiff's argument fails because an ALJ is not required to base his RFC finding on a medical opinion. Rather, as the Second Circuit has recognized—and as agency regulation requires—an ALJ should assess a claimant's RFC based on all the relevant evidence in the case record, not just medical opinions." Comm'r Mem. of Law 21, Apr. 16, 2018, ECF No. 14-1. The Commissioner cites to *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2015) (summary order).

An ALJ's RFC is based on more than just a medical opinion. 20 C.F.R. § 404.1545(a)(3) (Lexis Advance through the August 21, 2019 issue of the Federal Register. Title 3 is current through August 2, 2019) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence."). Nevertheless, in the absence of medical evidence, the ALJ may not substitute his own lay opinion to reach an RFC conclusion. S*ee Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2015) (summary order) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). In *Astrue*, and the case it cited, the ALJ had medical opinions on which to base his RFC determination. Here, in contrast, the ALJ had to base his

11

RFC determination solely on non-medical evidence. As the Court noted in *Goble v. Colvin*, No. 15-CV-6302 CJS, 2016 WL 3179901, at *6 n.10 (W.D.N.Y. June 8, 2016): "While the RFC may not need to 'specifically reflect *one* doctor's opinion,' the Court believes that the RFC must reflect *some* doctor's opinion, *i.e.*, it must be based upon competent medical opinion, which, as we will see, this RFC is not."

The Commissioner's ruling requires that to properly assess a claimant's RFC, the ALJ "must 'first identify the individual's functional limitations or restrictions and assess his or his work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, [etc.].'" *Hilsdorf*, 724 F. Supp. 2d at 348–49 (quoting *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P at *7 (S.S.A. July 2, 1996)). The Ruling goes on to state that the ALJ must assess a claimant's "ability to perform these functions in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.*; *accord Yates v. Comm'r of Soc. Sec.*, No. 5:06-CV-1406 (FJS), 2011 WL 705160, *6 (N.D.N.Y. Feb. 22, 2011). Although the ALJ relied on Plaintiff's testimony regarding his activities of daily living, that evidence is insufficient to support the finding of "light work." *Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("Consideration of such lay testimony is not a substitute for proper consideration of a treating physician's medical opinion."). Therefore, here, the ALJ's RFC determination does not have substantial support in the Record, and his decision must be reversed. Because of the Court's conclusion, it need not decide Plaintiff's contention that the ALJ improperly assessed Plaintiff's mental residual functional capacity.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings, ECF No. 13, and denies the Commissioner's cross-motion, ECF No. 16. The ALJ's decision is reversed, and the matter is remanded to the Commissioner for a new hearing pursuant to the fourth sentence of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

DATED:  September 30, 2019
        Rochester, New York

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge